PORTER *et al. v.* STATE.

(*Jackson,* April Term, 1941.)

Opinion filed May 24, 1941.

W. N. KEY, W. P. MOSS, JACK MANHEIN, and MAURICE NICHOLS, all of Jackson, for plaintiffs in error.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

Lee Willie Porter and Carl Leonard Cole, referred to herein as defendants, have appealed to this Court from a

conviction for murder in the first degree, their punishment being fixed at death by electrocution.

While several errors have been assigned on behalf of defendants, upon the argument of the case in this Court counsel virtually conceded that they were properly convicted, but made an earnest appeal for a recommendation to the Governor for a commutation of punishment to life imprisonment, due to the ignorance, lack of opportunity for a normal development, and the youthfulness of the defendants.

Upon a careful reading of the record, we find that the defendants are clearly guilty, were ably represented by counsel, and were accorded a fair trial by an impartial jury.

Due to the gravity of the crime, we will briefly review the main facts. The offense for which the defendants were convicted was the murder of Grant Vernon on the night of August 9, 1940. The deceased was the night watchman at the extensive plant of the Coca Cola Bottling Work in Jackson, and had been so employed for some time. There were some six or seven stations on the premises, including one at the garage where the trucks of the Bottling Works were parked, and it was the duty of deceased to punch a time clock every hour at each of these stations.

The Bottling Works employed a number of salesmen who left the plant each morning in trucks loaded with Coca Cola for delivery to its customers. These salesmen returned in the late afternoon or early evening, checked in with the deceased, and turned over the proceeds from sales to him, which he placed in the cash drawer in the office. This drawer was kept locked and deceased carried the key to it in one of his pockets. On the day in question one of the salesmen, Fred Milam, returned to the plant

at 5:10 P. M. and delivered to deceased $49.18 in cash. Another, Ed Stevenson, returned about 5:30 P. M. and turned over to deceased $136 in cash. A third salesman, Chester Butler, returned to the plant about eight o'clock and delivered his proceeds of sales to deceased in the sum of $133.50, including $8 in checks. Butler left the plant at nine-thirty-five. About five-thirty the next morning deceased was discovered at the back end of the premises, near the rear of one of the trucks, seated on the ground. He was unconscious and died about noon of that day without ever having regained consciousness. He had been struck in the head twice with some heavy instrument, which the attending physician testified caused his death. The keys of deceased had been taken from him and were found in the cash drawer from which about $300 in money had been taken. The holster in which deceased carried his pistol had been torn off and was lying near him, as was his time clock. There were pools of blood on the ground. The premises of the Bottling Works was inclosed with a wire fence 8 feet high. The gate through which the premises was entered was kept locked at night.

According to the confessions of defendants, they procured a heavy iron bar at Tannenbaum's junk yard, 7¾ pounds in weight and 32 inches in length, climbed over this 8-foot fence, secreted themselves in or about the garage for the purpose of knocking deceased in the head and robbing him, and just after he punched his clock at the garage station struck him two blows with this iron bar, took his keys and pistol, entered the building and opened the cash drawer with these keys, extracted the money therefrom, left the building, threw the iron bar in the cemetery, located across the street from the Bottling Works, divided the money, and then separated.

Among the funds taken from the cash drawer were two packages of nickels which had been procured from a local bank and placed in the cash drawer in the paper in which they were wrapped by the bank. This paper bore the stamp of the Coca Cola Bottling Works.

In some way not definitely disclosed by the record suspicion was directed to Porter. It appears that his wife was spending a considerable amount of money, much more than her economic condition would justify. Also, the officers had information that Porter had lost some money in a crap game. In any event, Porter was arrested and carried to the city jail on the afternoon of August 10, 1940. At the time of his arrest Porter had $50 in money on his person. Beginning about ten-thirty that night and continuing intermittently until four o'clock the next morning Porter was interrogated by the officers. At the hour last named Porter stated to the officers that he had seen his codefendant in the vicinity of the Coca Cola plant with some money sacks and that Cole had given him $10 not to tell on him. Shortly thereafter the officers accompanied Porter to the place where he lived where, under the floor of the coalhouse, Porter produced $38 in money, including the two packages of nickels referred to above. From this same hiding place Porter produced the 45-caliber pistol which was identified as the one that the Bottling Works had furnished the deceased. Porter then made a full confession, telling the officers where they had deposited the iron bar in the cemetery, and where it was discovered the next morning by the sexton of the cemetery. The sexton testified that he passed the exact spot where the bar was found late on the preceding afternoon and it was not there.

When Cole was arrested he strenuously denied his guilt, but when confronted with Porter, who repeated

the occurrences of the night of August 9, 1940, Cole likewise confessed. Both confessions were reduced to writing and verified by the defendants. Each, however, insisted that it was the other who inflicted the fatal blows with the iron bar.

Neither defendant testified in his own behalf.

■ From the foregoing it appears beyond any doubt that the defendants deliberately planned and executed this diabolical crime, and we are unable to find any extenuating or mitigating circumstances to relieve them of the punishment imposed by the jury. Both defendants are negroes.

At the time of the crime Porter was nearly nineteen years of age and was living with his wife about two and a half blocks from the Bottling Works. It appears that he was born out of wedlock, his reputed father having died in the penitentiary. He only attended school a few months and was considered a backward pupil. One witness testified that he was a waif upon the streets of Jackson. There is no testimony, however, that he did not know right from wrong, or did not possess sufficient mentality to realize the enormity of his crime.

The defendant Cole was twenty-two years of age when this crime was committed, lived with his wife, was an irregular employee of the Bottling Works, and was familiar with the manner and custom by which its business was conducted. There is no suggestion that Cole was subnormal or mentally deficient, and it is not unlikely that he planned and engineered this homicide and robbery. Both defendants had lived in Jackson all of their lives. So that, with respect to the facts, we see no basis for interfering with the verdict of the jury.

■ We think the confessions of the defendants were properly admitted in evidence. It has been held repeat-

edly by this Court that extrajudicial confessions are admissible in evidence when voluntarily made. See list of cases in Michie's Digest of Tennessee Reports (new), vol. 4, p. 269. Nothing appears in the record before us to indicate that these confessions were not voluntary, and they recite that they are so made. Neither is there any evidence that they were extorted from the defendants by fear or hope. We reaffirm the following statement in *Rounds v. State,* 171 Tenn., 511, 517, 106 S. W. (2d), 212 214, to-wit: "Resort to torture, in any form, by officers of the law, is not to be countenanced." The facts of the case before use, however, do not bring it within that rule.

Error is assigned upon the failure of the trial judge to instruct the jury sufficiently as to the fact that the confession of each defendant made outside the presence of the other was not admissible against such absent party. The trial court not only included such instruction in his charge, but upon the introduction of each confession specifically and voluntarily instructed the jury that it could not be considered against the other defendant. This was sufficient.

It is next insisted that the trial court erred in his charge to the jury with respect to the punishment; in other words, that the court erroneously instructed the jury that the punishment for murder in the first degree was death by electrocution when, in fact, section 10771 of the Code provides:

"Every person convicted of murder in the first degree, or as accessory before the fact to such crime, shall suffer death by electrocution, or be imprisoned for life or over twenty years, as the jury may determine."

Section 10772 provides as follows:

"When any person is convicted of the crime of murder in the first degree, or as an accessory before the fact

of such a crime, it shall be the duty of the jury convicting him in their verdict to fix his punishment, which punishment shall be death in the mode prescribed by law for the infliction of the death penalty in capital cases, or the jury may, if they are of opinion that there are mitigating circumstances, fix the punishment at imprisonment in the penitentiary for life, or for some period over twenty years.''

There is an apparent incongruity in the two sections just quoted in that in the first the jury does not have to find mitigating circumstances, as they do in the second, in order to fix the punishment at imprisonment in the penitentiary. The difference however, is more imaginary than real. Upon this subject the court charged the jury as follows:

''If you find the defendants guilty of murder in the first degree, as charged in the indictment, it is your duty to fix the punishment. The punishment for murder in the first degree is death by electrocution, and if you find the defendants guilty of murder in the first degree, you will return a verdict that you find the defendants guilty of murder in the first degree, and fix their punishment at death by electrocution, unless you shall find and say in your verdict that there are mitigating circumstances, in which event you may fix their punishment at imprisonment in the penitentiary for life, or for some period over twenty years. By mitigating circumstances are meant that there are some facts or circumstances in the case which, although you may deem them insufficient under the law to justify or excuse the act, yet in the opinion of the jury, are sufficient to mitigate the enormity of the offense, and, considering the weakness and infirmity of human nature, may be regarded as furnishing some show

or moral excuse for the deed though no legal justification.''

By this instruction the court said to the jury, in effect, that if they found the defendants guilty of murder in the first degree they should fix their punishment at death, unless, under the facts and circumstances appearing, they thought the punishment should be imprisonment instead of death. Construing the two sections together, we think the clear legislative intent was to leave it to the jury to fix the punishment, and that is what the trial court did in the foregoing instruction. In our opinion there was no basis for any misunderstanding by the jury as to their authority in fixing the punishment, and although the instruction was technically inaccurate, it was not prejudicial or misleading.

It is finally insisted that the court erred in failing and refusing to specifically charge the jury in response to a question from the foreman after the jury had retired to consider their verdict, the question and the response of the court being as follows:

''Judge, some question came up as to whether or not, if these defendants were sentenced to life imprisonment, or 99 years, could they be pardoned in say ten or fifteen years?

''Judge JOHNSON: The only instructions to govern your actions as jurors are embodied in the written charge which is in your possession.''

We consider this a proper response to the inquiry. It was the province of the jury to pass upon the guilt or innocence of the defendants and, if found guilty, to decide what punishment their crime merited. The power to grant pardons is vested exclusively in the Governor, and the jury should not engage in speculations as to what he may or may not do with respect to those incar-

cerated in the penitentiary. If the court had responded to this inquiry of the jury by stating that the Governor had the power to pardon at any time he saw proper to do so, or the court had stated to the jury that the Commissioner of Institutions has the authority to parole a life prisoner after serving twenty-five years, less time for good behavior, and the jury had thereupon fixed the punishment at death, the defendants would have had good ground for insisting that but for this instruction the jury would likely have imposed only a penitentiary sentence. It is inferable from this inquiry that the jury was considering a life term in the penitentiary only on condition that the defendants could not be pardoned; hence, had the court advised them that they could be pardoned at any time after conviction, the jury most likely would have imposed a death sentence. In this view of the case it cannot be said that the refusal of the court to answer the inquiry was prejudicial to the defendants.

The crime committed by these defendants is one of the most brutal that we have been called upon to consider. That being true, and the guilt of the defendants being established beyond any reasonable doubt, we see no occasion for recommending a commutation of punishment from that fixed by the jury.

Finding no reversible error in the record, it results that the judgment of the trial court will be affirmed, and the date of execution set for Thursday, July 24, 1941.