BROWN *v.* STATE.

(*Nashville*, December Term, 1947.)

Opinion filed May 3, 1948.

H. FRANK TAYLOR and TRIGG MOORE, both of Nashville, for plaintiff in error.

NAT TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

Albert Percy Brown, alias Hickory Brown, who will hereinafter be called defendant, was convicted of committing an assault and battery upon Barbara Graham, a girl just under the age of eight years, with the intent to carnally know her in violation of Code Section 10785. He was also found to be an habitual criminal as defined by Chapter 22 of the Acts of 1939, carried in Williams' Code as Section 11863.1. He was, accordingly, sentenced to serve the remainder of his life in the penitentiary as provided by Section 2 of that law, Code Section 11863.2. He has appealed from the judgment of the Court overruling his motion for a new trial and by his twenty-one assign-

ments of error presents the material questions hereafter stated and determined.

The assault occurred near 7 p. m. on May 13, 1946. Barbara had been sent by her mother to a drug store less than two blocks from their apartment. She says that as she was in the act of passing a moving picture theatre on her way to the store she was stopped by a friendly man who wanted her to come and look at his beauty shop, which was in the same city block. After some hesitation upon her part and further urging upon his part, including an offer of a quarter, she went with him, and the two entered the shop after he unlocked the door with a key which he had. No one else was there. He showed her various articles and in the course of doing so carried her to a. back room where there were two beds. He pushed her down on one of the beds and thereupon did certain acts which conclusively disclosed an intention to then and there carnally know her. After a brief struggle she escaped without being harmed, went immediately to the drug store, then returned home and told her mother what had happened.

The police were immediately contacted and arrived promptly. Barbara gave then such description of the man as she could. They then procured and exhibited to her a photograph of the defendant. She, according to the officers, positively identified this photograph as being that of the man who had assaulted her, and repeated this positive identification a few days later. A diligent but unsuccessful search for him was at once made. Months later he was found in Texas.

Upon the trial, the State introduced Barbara as a witness. At no time during her direct examination did the State ask her whether the defendant is the man who com-

mitted the assault. On cross-examination she testified that she had seen the defendant in the Court room from time to time during the several days of trial and had been looking at him. She was then asked whether he was the man who had assaulted her. She replied ''No'm, that is not him. Q. That is not the man is it? (Indicating the defendant.) A. No'm.''

On the direct examination which preceded, Barbara was asked if the officers showed her ''some pictures'' shortly after the assault and whether she identified one of these as being that of the man who assaulted her. Her reply was that the officer handed her only one picture and after looking at it she said ''I think that is him, I am not sure''. She then was asked whether the officer had handed her ''those pictures'' during the trial and whether she had gone through them and picked out ''the picture of the man'' who assaulted her, and she replied ''Yes, sir, I think it was'' and that it was the picture which had been exhibited to her shortly after the alleged assault. While testifying she was requested to go through these pictures and pick out this photograph again. She did so, and was then directed to continue to examine the group of photographs and say whether there was another which resembled the man who assaulted her. She selected another and then testified that the two were the same ones that she had previously picked out for the officer during the trial. They were, in fact, photographs of defendant, and were admitted as exhibits over his objection. This action of the Court is assigned as error.

■ Generally speaking, photographs are admissible in evidence. *Hughes* v. *State*, 126 Tenn. 40, 148 S. W. 543, Ann. Cas. 1913D, 1262. It is said in 20 American Jurisprudence, pages 607, 608, that the reason for the admis-

sibility of photographs as testimony "rests fundamentally on the theory that they are the pictorial communications of a qualified witness, who uses this method of communication instead of, or in addition to, some other method." It is said by Wigmore, Volume III, Section 792 that "a photograph, . . . is a witness' pictured expression of the data observed by him and therein communicated to the tribunal more accurately than by words. Its use for this purpose is sanctioned beyond question." This authority at Section 745 observes that a photograph defines the recollection of the witness as "one recorded at or near the time of the events".

 It is said by defendant that the rule just stated does not apply here because of the best evidence rule. It is argued that the identity by way of photographs of the defendant as the person who committed the assault is not permissible since the defendant is present in person and is the best evidence of whether he is the man. This question seems to have been conclusively settled contrary to the insistence of defendant by the decision of this Court in *Williams* v. *State*, 179 Tenn., 247, 165 S. W. (2d) 377, 378, to which we are referred by the State. There it is held that "only documents or things bearing writing can be within the purview of" the best evidence rule. In that case the Court quoted with approval from *Corpus Juris* as follows: "Likewise the best evidence rule does not apply to proof of the nature, appearance and condition of mere physical objects, but these facts may be proved by parol . . . even where the objects themselves are present in court."

 Officers Spann and Cole, after testifying that on the night of the attack Barbara gave them a description of the man, were asked "after you got the description

who did you start looking for". Each replied "Hickory Brown". It is not necessary to consider defendant's insistence that this is hearsay; therefore, incompetent. As pointed out in the State's brief, Officer Ritter had at that time been asked the same question and gave the same answer without objection being made. So, the testimony was merely cumulative and without prejudice.

When Mrs. Graham, mother of Barbara, was called by the State as a witness the Court administered the oath. In the course of her direct examination the State asked her if she had been offered $2,000.00 or any other amount "to drop the prosecution". She replied "No". Defendant insists that all this was improper and prejudicial in that it inferred that she had influenced the testimony of her daughter Barbara.

 It does not appear that Mrs. Graham had previously been sworn. Further, the swearing of a witness by the Court is a common practice and does not cast the slightest reflection upon such witness. The effect of whatever unfavorable implication may have been intended by asking Mrs. Graham if she had been offered money to drop the prosecution was prevented by her positive answer in the negative.

In considering the insistence that the evidence preponderates against the verdict, it is important to note that according to the testimony of Barbara the man who assaulted her was at or near the theatre when he first stopped her. The evidence shows defendant to have been at that point around that time. This man had a key with which he unlocked the shop. The shop belonged to, and was operated by, Mrs. Taylor, who was a sister of defendant. On the day of the assault, and on the previous day, the defendant had been engaged in painting

the interior of this shop. Mrs. Shaver, an employee, left him there when she quit work at 5 p. m. on the day of the assault. The painting was not finished but defendant did not return the next morning or thereafter.

There was a drug store near by. It is shown by two of its clerks that defendant for some time prior to and including May 13, had been in the habit of coming with fair frequency to this store. Both clerks testified that near 6:30 p. m. on that day he came in the store and bought something. This date and transaction was impressed upon their memory because later that night officers came and inquired about defendant, and the clerks were informed at that time of the trouble. They never saw the defendant at the store again.

The owner of the beauty shop had a grown son, Percy Taylor. He was not in good health, and was in the habit of going into the bed room of the shop in the afternoon for a rest. It is conclusively established that he was elsewhere at the time Barbara and the man were in the shop. After Barbara had given the officers a description of the man they immediately started a search for defendant. However, after receiving that description, they likewise brought Percy Taylor to Barbara for the purpose of having her say whether or not he was the man. She told them no.

It may also be reasonably said that the importance of the officers' search for the defendant after receiving a description from Barbara is somewhat minimized by the fact that he was a police character well known to the officers, who likewise knew at the time they began their search that he was a brother of the owner of the shop.

Mrs. Graham and Barbara testified that only one picture was handed to Barbara on the night of the assault

and a few days later, and that Barbara looked at it and said "I think that is him, I am not sure". This was a picture of defendant. Barbara's testimony on this point is somewhat weakened by her answer to the first question asked her as a witness with reference to the picture, that question being whether she picked "this man's picture out of some" handed her. Her answer was "when he brought them out . . . " It will be noted that she uses the word "them" in referring to the picture. Shortly thereafter, she volunteered the statement that they "Just brought one". There is no evidence of any corrupt motive or improper conduct upon the part of Mrs. Graham or Barbara in connection with the testimony of this child.

No evidence was offered in behalf of defendant.

█ When we consider the fact that the man who made the assault upon Barbara had a key to the shop and that defendant was employed there at the time and was a brother to the operator, it is not unreasonable to conclude that he was in possession of a key. However, such possession by a stranger to the shop would have been most unusual. Nor would such stranger have been likely to have carried his intended victim there. A few minutes before the assault defendant was seen near the theatre where Barbara says the guilty man stopped her. Within a short while thereafter she, according to the officers, positively identified a photograph of the defendant as being that of the man who had stopped her at this place. According to her testimony and that of her mother, when this picture was shown her that night she said she thought it was the man. She did not then know that a drug store clerk had seen defendant near this theatre about the time of the assault. Defendant was not

to be found that night at any of the places he frequented, but had disappeared. He did not return the next morning to complete his unfinished painting. His whereabouts remained unknown until he was located in Texas. His sudden disappearance immediately after the assault is unexplained. That disappearance, under the circumstances, is consistent with his guilt, but inconsistent with his innocence. The fact that Barbara testified that he is not the guilty man and at the same time expresses the belief that photographs of him are photographs of the guilty man effects only the weight to be given her testimony; and that is a matter for the jury.

After considering all the facts and circumstances of this unique case, we find that the evidence does not preponderate against the verdict.

Chapter 22 of the Acts of 1939 carried in Williams' Code commencing with Section 11863.1 provides that any person who has been three times convicted under the laws of this State, or three times "under the laws of any other state, government or country of crimes, two of which, if they had been committed in this state, would have rendered him infamous" may be found by the jury to be an habitual criminal upon conviction here of a fourth felony. The third count of the indictment charged the defendant with being an habitual criminal in that he "has been three times convicted under the laws of other states" of such crimes.

By the introduction of certified records, as provided by this statute, it was established that Jack Dillon, alias Percy Brown, was convicted of grand larceny in the Courts of Utah and that Percy Beaumont was convicted of bank robbery with fire arms in the Courts of Missouri. It was stipulated that Percy Beaumont is the defendant,

Percy Brown.. He was sentenced to the penitentiary in each case. Conviction in this state of grand larceny or robbery renders the party infamous under Code Section 11762.. The State also introduced a certified record of a United States District Court for an Alabama District reciting the conviction of Percy Beaumont of violation of the White Slave Law, a federal crime. It was upon these three records that the jury found defendant to be an habitual criminal as defined by the 1939 act, after finding him guilty under the second count of the assault and battery, etc., upon Barbara.

It is asserted that there is a fatal variance between the indictment and the proof, in that the indictment charged three convictions "under the laws of other states while the proof shows that one of these convictions was under the laws of the United States Government". It is also insisted for the same reason that the Court erred in charging the jury that if they found that defendant had been convicted three times of the offenses mentioned by the habitual criminal statute under the laws of another state, government or country, they might find him to be an habitual criminal, provided they also found him guilty of having made the felonious assault mentioned in the second count of the indictment.

In 27 American Jurisprudence, page 725, the rule is stated to be that unless it appears that a variance "is prejudicial to the rights of the accused, it will not be deemed material". It is also stated in this volume, page 723, Section 178, that "it is the universal rule that a variance between pleading and proof in a criminal case is not material . . . where the variance is not of a character which could have misled the defendant at the trial", and that the variance is immaterial "if the allega-.

tion was surplusage''. In that same section the author cites the Missouri case of *State* v. *Hefflin*, 338 Mo. 236, 89 S. W. (2d) 938, 103 A. L. R. 1301, as authority for his statement that ''it is not vital to a prosecution under an indictment charging the accused with a statutory offense and also as a second offender that pleading and proof conform on the latter point''.

It is provided by Section 5 of our Habitual Criminal Law that if an indictment charges a person, who is an habitual criminal as defined by that law, with the commission of any of the felonies specified and if he is convicted of that charge, then the jury may also find such person to be an habitual criminal, ''and no such indictment or presentment shall be subject to any objection for failure to specifically include a charge that such person is an habitual criminal''. Accordingly, it is held that in order for the jury to find that the defendant is an habitual criminal it is not necessary that he be so charged in the indictment which charges him with the fourth felony. *McCummings* v. *State*, 175 Tenn. 309, 134 S. W. (2d) 151; *State ex rel. Grandstaff* v. *Gore*, 182 Tenn. 94, 184 S. W. (2d) 366.

The third count in the indictment was, therefore, surplusage in that it was not necessary in order to authorize the jury to find the defendant to be an habitual criminal.

In *Tipton* v. *State*, 160 Tenn. 664, 28 S. W. (2d) 635, 639, it is held that ''the statute itself is notice to the accused and his counsel that proof of a former conviction will be competent, and that he may be required to meet evidence of the fact; that such notice is as effective as a statement of the fact of a former conviction in the indictment itself''. The rulings stated are

necessarily predicated upon the fact that "being an habitual criminal is not made an independent offense". Its only effect is to increase the punishment to life imprisonment for a fourth offense. *State ex rel. Grandstaff* v. *Gore, supra* [182 Tenn. 94, 184 S. W. (2d) 367].

For the reasons stated and upon the authorities referred to, the insistence as to a variance and as to the charge of the Court in reference to this is overruled.

When the Judge who presided over this trial had completed his charge to the jury he informed the parties that he would be unable to return to Court over the week end and had, therefore, arranged with the regular Judge of the other criminal division of this Court to receive the verdict. The defendant and his attorneys neither consented nor objected. On the next morning, the verdict was received by the other Judge. It is now insisted that a new trial should be granted because of that occurrence.

In some jurisdictions, and perhaps this is the weight of authority, it is held that the reception of the verdict is a judicial act which cannot be delegated even with consent of defendant. These courts, accordingly, hold that a verdict so received in a felony case is vitiated. 53 American Jurisprudence, page 706. While the question seems to be one of first impression in this State, our case of *Moss* v. *State*, 131 Tenn. 94, 109, 173 S. W. 859, 862, Ann. Cas. 1916B, 1, observes that other jurisdictions consider the receipt of the verdict to be "merely a ministerial act".

In keeping with the decided trend of the Courts to disregard highly technical objections when it is clear that no prejudice to defendant has resulted, it seems proper to reject the theory that such verdict so received is vitiated, when it is apparent, as in this case, that the verdict

received by the substituted judge is the one which the jury would have returned to the judge who presided at the trial. However, the practice is dangerous and is to be seriously discouraged.

In point here is the North Carolina case of *State v. Austin*, 108 N. C. 780, 13 S. E. 219, 221 L. R. A. 1917E, 1091. In this case the Court held that "the defendants had the right to have the verdict rendered in the presence of the judge, and it is best that it should always be done. But it is certainly competent, except in capital cases, for it to be received by the clerk if no exception is is made, and opportunity is given the defendant to object." Applicable also is Code Section 10654 which prohibits the setting aside of a verdict when it affirmatively appears that an error in procedure has not affected the results of the trial. This assignment of error must, therefore, be overruled.

There are two other assignments of error directed to the admission of evidence and four others directed to the charge of the Court. They have been considered and are overruled. It is not necessary to discuss these assignments other than to point out that in view of the holding which we have made in this case on the questions discussed these further insistences have either become immaterial or have been necessarily disposed of by the ruling which we have made on the questions discussed and determined. We think this will become apparent to counsel as they read this opinion.

Judgment affirmed.

All concur.