JOHN ARTHUR HALE *v.* STATE OF TENNESSEE.

(*Nashville,* December Term, 1954.)

Opinion filed May 6, 1955.

462

Z. Alexander Looby, of Nashville, and H. T. Lockard, of Memphis, for plaintiff.

Nat Tipton, Assistant Attorney General, for the State.

Mr. Justice Swepston delivered the opinion of the Court.

The defendant was indicted, tried and convicted for an assault and battery upon a child under the age of 12 years with intent to carnally know her and the punishment fixed at death from which he appeals.

A brief statement of the facts follows:—The child was 8 years old at the time of the assault and the defendant who is a young negro, was 19 years of age, unmarried but the father of one child according to his own testi-

mony. On the 17th day of October, 1953, the defendant and some other negroes were cutting sod in a field in the south part of Memphis near what is known as Non Connah bottom. The little girl on whom the assault and battery was committed and a little boy about the same age intended to have a picnic in this field a short distance down below the area of their homes about mid-day. After they had gone down into that area the defendant succeeded in luring the little girl away from her companion and from the observation of four other young boys who were playing in the vicinity, by his continued insistences that he was going to show her a turtle; he succeeded in having her follow him into some nearby tall grass and there committed the crime.

The child testified that after he succeeded in getting her out into the high weeds in a secluded place, he compelled her to remove her underwear, made her lie down on the ground and assaulted her three times and afterwards before he released her he compelled her to let him kiss her in a very lascivious manner. The little girl testified also, which was confirmed by the medical examination had very shortly thereafter, that her vagina was not penetrated but to the contrary her anus.

Shortly after the commission of this crime and on the same afternoon plaintiff left Memphis, went to Arkansas, and later to Detroit, where he was apprehended by the F. B. I. on a Federal warrant and brought back to Memphis.

The defendant's defense is that he did not molest the child in any way, that he was not away from the point of work long enough to have committed the act and that in fact the only time that he was away from work from early morning until all of the sod-cutters quit shortly

after noon, was when he went in a car with another one of the negro workmen to get a soft drink.

There is no need to discuss the preponderance of the evidence because the proof is overwhelming to the effect that he was guilty as charged.

The 13th assignment of error complains of the over-ruling of his motion for a new trial in which it was alleged that there was no evidence on which the jury could find the defendant guilty of the offense charged in the indictment. It is said that the State's evidence showed only the commission of a crime against nature and that there was no evidence of an intent to have carnal knowledge of the little girl.

This insistence is based solely on the fact that the defendant did penetrate the anus and not the vagina. The defendant did not testify on this point at all. He simply denied having molested the child in any manner.

■ Under an indictment under this section of the Code, 10785, the guilty intent is the gravamen of the charge and not the consummation of the intent. In *Carter v. State,* 181 Tenn. 259, 264, 181 S. W. (2d) 137, 138, this Court said:

"The offense charged is not the actual commission of the crime, which might include different degrees or other offenses, but is a charge of an assault with a single intent to commit a specific offense. It is the intent with which the assault is committed that constitutes the offense. The intent only gives the assault its felonious character. The intent forms the gist of the offense, and where the intent constitutes the offense it must be proved. 1 Whar. Cr. Law, sec. 1279; (Jones v. State) 2 Swan 399."

The fact that he did not accomplish his purpose is by no means determinative of whether or not he harbored

the intent but is simply a fact to be taken along with any other evidence. In *Brown* v. *State,* 186 Tenn. 378, 382, 210 S. W. (2d) 670, 672, the conviction violating this same statute was sustained where the Court said:

"He pushed her down on one of the beds and thereupon did certain acts which conclusively disclosed an intention to then and there carnally know her. After a brief struggle she escaped without being harmed, went immediately to the drug store, then returned home and told her mother what had happened."

In *Davis* v. *State,* 186 Tenn. 195, 198, 209 S. W. (2d) 7, the opinion in the last paragraph on that page, cites *Commonwealth* v. *Shaw,* 134 Mass. 221, where the child, when thrown on the floor by defendant fell on her hands and knees; it was held that the fact that the child was placed in such a position that penetration was impossible was no defense to a charge of assault with intent to carnally know her.

Now as to the evidence of intent in this case, we have in the first place, the fact that the defendant picked out as his victim a female when there was a little boy available at the same time, if his intention had involved only that of sodomy or a crime against nature; the proof showed also that there were four other boys playing in the same general area. Instead, the little girl testified that the colored man suggested that she and her playmate, Charles, split up and one go one way and one the other (R. 188). Again (R. 193), the child testified as follows:

"Q. Now, talk out plainly. What did he say to you at that time? A. He asked me if boys ever did anything to me.

"Q. What did you say? A. I said no, they were perfectly nice boys.

"Q. Did he ask you anything else? A. I said, 'I don't understand what you mean,' and he said, 'You know.' I said, 'I still don't understand,' and he said, 'Like * * *.'

"Q. Talk as loud as you can. A. He said 'Like pulling down your panties,' 'No, I don't like to do that and they never do talk about it.'

"Q. Did he say anything else to you? A. He told me that he'd like to do it, and I said—, well I became frightened and I was scared and he said he'd like to do it.

"Q. He said he'd like to do it? A. Yes.

"Q. What did he say then to you? A. He asked me if I wanted to do it with him and I said 'No sir;' I said, 'mother might be looking for me,' that I had better go home.

"Q. What did he say when you told him you had better go home? A. He told me 'no, I cannot go home and I can't—.

"Q. Did he tell you to do anything? A. Not right then.

"Q. All right. A. I began to get real frightened and I was scared, I was just so scared that I couldn't do nothing.

"Q. All right, then what happened? A. He told me to pull off my pants and I said 'no, that I wouldn't do it;' and he told me to go on, if I didn't he was going to choke me.

"Q. Did you pull off your pants? A. Yes, sir, I was just scared as anything and I was going to do what he said.

"Q. Then what did he tell you to do after you pulled off your pants? A. He told me to lay down on the ground and I told him I didn't want to do that and he told me if I didn't he was going to choke me and I got scared—

"Q. Did you believe him when he told you that he was going to choke you? A. Yes sir, I was scared. You can't tell about other people—you don't know.

"Q. Did you lay down on the ground? A. Yes sir.

"Q. Then what did he do? A. Well, he unbuttoned his pants and took out what we call a ding-dong.

"Q. That is part of his person, is that right? A. Yes sir.

"Q. And then what did he do, Linda? A. He got on top of me and put it in me.

"Q. He put it inside your body? A. Yes.

"Q. Where? A. In my back.

"Q. Is that where you do what you call number two? A. Yes sir.

"Q. Where were your legs? What did he do with your legs? A. *Well, he didn't do nothing right then.* I put my legs down and he finally put them over his shoulders and he held them."

Then the child testified that after he had abused her in the anus she said she had to go to the bathroom and he told her to go into the weeds, and then told her to hold up her dress. After making her submit to this sort of treatment three times altogether, they started to go out of the tall weeds when he insisted on her kissing him in the mouth and "he wiggled his tongue around in my mouth some way."

██ The above evidence taken with the fact that he had begotten a child on the person of another female at

some previous time, and in the absence of any evidence of perverted sex habits, we think the jury was warranted in finding that the defendant committed the assault and battery on this child with the intent to have sexual intercourse with her, that is to have carnal knowledge of her but for some reason changed his mind to the extent that he committed an act on her that he could just as well have committed on a male person.

For further very clear authority to the effect that failure to accomplish the original purpose, or an abandonment of the original purpose, does not nullify the original guilty intent. See: *McEwing* v. *State,* 134 Tenn. 649, 653, et seq., esp. 656-657, 184 S. W. 688.

We, therefore, overrule assignment No. 13.

Assignments 11 and 12 complain of the refusal of defendant's special requests to the effect first, that the jury must find that the assault and battery were committed with the intent to have unlawful carnal knowledge and that it would not be enough to find that he had the intent to enter the rectum, and second, that the commission of an assault and battery for any other purpose was not punishable under the indictment in this case.

The Court charged the jury in the language of the statute, Code Sec. 10785, under which the indictment was laid; also in the language of Section 10781 relating to the punishment for rape; also the two lesser offenses of an attempt to commit a felony and an assault and battery, and later on the charge explained to the jury how they should proceed to first determine whether or not the defendant was guilty of the offense charged and if not, then next in order the two lesser offenses included within the indictment.

He then charged as to how they should proceed to fix

the punishment according to what they should find the defendant to be guilty of.

■ We think the charge as given was full and sufficient and that the giving of these special requests would probably have tended to confuse the jury by over-emphasis on the fact that he did penetrate the anus; especially the second one which commences with an incomplete sentence that is meaningless.

Assignments 11 and 12 are accordingly overruled.

Assignments 1 and 2 complain that it was error for the Trial Judge to hold that the 12 jurors who sat on the case were competent and to require the defendant to accept them over his protest, the defendant having exhausted all his challenges, because it is said that on the voir dire examination of said jurors the Attorney General stated in advance to the jurors what the facts of the case would be, and on such statement of facts pledged said jurors to render a verdict of guilty and to fix the defendant's punishment at death by electrocution. Briefly, the procedure on the part of the Assistant Attorney General was that he made a brief statement of what he called the facts, just a bare statement of what the case was about, that is, a nine-line paragraph statement; he then read Code Sec. 10785, under which the indictment was laid; he then read Section 10781, with reference to the punishment for rape which applies if the accused is convicted of the offense for which he was indicted. That section provides that the penalty shall be death by electrocution, provided the jury before whom the defendant was tried and convicted may if they think proper, commute the punishment for the offense to imprisonment in the penitentiary for life or for a period of not less than 10 years.

He then proceeded as follows:

"Now Gentlemen, in this case the State is demanding the death penalty and I will ask each of you individually, do you believe in capital punishment in proper cases?

"Mr Gresham—Yes.

"Mr. Smith—You do—Mr. Gresham? Yes.

"Mr. Smith—If the State proves this man guilty of this offense, under the charge given you by the Court would you vote to convict him and fix his punishment at death by electrocution?

"Mr. Gresham—Yes."

Substantially, the same method of examination was followed by the Assistant Attorney General and subsequently by the Attorney General in the examination of other prospective jurors.

Whatever defect may or may not have existed in this method of examination on the voir dire, we need not now decide because of subsequent proceedings.

■ When the State had accepted the entire list of prospective jurors, counsel for defendant moved that the entire list be disqualified for cause, which motion was overruled. This motion was, in effect, a challenge to the array or a motion to quash the panel of prospective jurors, but since the same was not in writing, the defendant cannot now complain of error on the part of the Court in overruling the same. Caruthers History of a Lawsuit, 7th ed. (Gilreath), Sec. 325, Note 68, citing *Mahon* v. *State,* 127 Tenn. 535, 156 S. W. 458, and *Cooley* v. *State,* 174 Tenn. 168, 124 S. W. (2d) 250. Also:— *Monday* v. *Millsaps,* 37 Tenn. App. 371, 264 S. W. (2d) 6, 16; *Luchessi* v. *Barnard,* 7 Tenn. App. 353 (no petition for certiorari filed).

Counsel for defendant then proceeded to examine the jurors and eventually he accepted five jurors and per-

emptorily challenged seven, leaving him eight more peremptory challenges. Examination continued until defendant accepted three more jurors and peremptorily challenged four, leaving him four such challenges. Proceeding further, he accepted two jurors and challenged two, leaving him two challenges. He then accepted one and excused one, and finally exercised his last peremptory challenge. Then the 12th juror was called and he fully qualified as a proper juror to sit on the case and thus the jury was made up.

A further complaint under these two assignments is that the Court overruled his challenge for cause of the five jurors whom defendant, as above stated, accepted. We see no merit in that complaint because, as appears from the above statement, defendant having at that time eight peremptory challenges which he could have exercised but did not do so.

A further complaint under these assignments is that having exhausted all of his challenges before the 12th juror was examined, defendant was required to accept him. There is no merit in this contention, because the 12th juror was clearly competent. *Mahon* v. *State*, 127 Tenn. 535, 545, 156 S. W. 458. If by reason of having been forced to exhaust his peremptory challenge on some incompetent jurors, allegedly erroneously held competent by the Trial Judge, he had been forced to accept subsequent incompetent jurors, a different question would be presented. *Mahon* v. *State*, supra, 127 Tenn. at page 546, 156 S. W. 458.

Assignments 1 and 2 are accordingly overruled.

The 3rd and 4th assignments of error arise out of the action of the Court in regard to the introduction of a hospital record made wholly in the handwriting of Dr. Gilbert, the physician attending the little girl imme-

diately after the occurrence of this tragic incident. The first paragraph of this report consisted of the history of the case as given to the physician and read as follows:

"P. T. is an 8-year-old W. F. who was playing in some tall grass with other children when a 19-year-old C. M. took her away from the group and attacked her."

The second paragraph of the report was a statement of the findings of the examining physician.

■ Under assignment three the complaint is that the Court ruled that the defendant could not introduce the latter part of the record alone, but must introduce the entire record. Defendant insists that he wanted to introduce only the record of the findings of the physician for the purpose of impeachment of the physician. For two reasons there is no merit in this assignment. First—the hospital record was not introduced by the custodian thereof, but by agreement between the State and defendant's counsel and the agreement not specifying a particular part of the same, would necessarily be an agreement to introduce the whole. Secondly—there is no contradiction or inconsistency between the testimony of Dr. Gilbert, who was introduced by the State and who testified from his recollection rather than from the hospital record, and the hospital record itself, hence the defendant suffered no prejudice.

The fourth assignment complains that when the defendant called the custodian, Miss Spears, of the hospital record, the State on cross-examination of this witness, was allowed to have her read the first paragraph of the hospital record which was the hearsay history of the case given to the doctor.

■ If this first paragraph containing the history of the case as given to the doctor by some undisclosed person

be conceded to be hearsay, its introduction in evidence was not prejudicial to the defendant for the reason that the very same purported facts appearing in said history of the case, and more, were amply proved by the State by other witnesses, so that no prejudice could have resulted.

The fourth assignment is accordingly overruled.

█ The fifth assignment of error complains of the action of the Court in allowing the mother of this child to testify as to the condition of the child's rectum as she observed it a few days before the trial which was about five months after the occurrence of the injury. If it be conceded, as insisted by defendant, that this evidence was too remote, nevertheless, it could hardly be said to be prejudicial for the reason that the doctor's testimony and the hospital report showed the condition immediately after the injury to be much worse than it was at the time the mother testified. The assignment is, therefore, overruled.

The predicate for the sixth and seventh assignments is the fact that defendant fled the state on the same afternoon or night of the day the alleged crime was committed and went first to Arkansas and then to Detroit, where he was arrested under a Federal warrant and returned to the state by the Federal authorities, and when arrested by the witness Sullivan, a statement was taken from him by Sullivan. Under the sixth assignment it is complained that it was error for the Court to allow the witness Sullivan to be asked and answer the following:

"Q. Was he returned here by Federal or State authorities? A. By Federal authorities."

█ It is insisted that said testimony was incompetent for any purpose and that the obvious purpose was to

show that defendant refused to waive extradition. A sufficient answer to this assignment is that there is no evidence in the record that defendant did refuse to waive extradition; the State was not allowed to interrogate on that point.

The seventh assignment complains that Sullivan was allowed to be asked, and to answer the following question by the State:

"Q. At any time during the time of your interrogation of the defendant, did he say whether or not he saw a little white girl in the neighborhood of South Wall Street or Fairlawn Subdivision?"

The complaint is that said question was leading and suggestive and that the witness' answer contained alleged damaging admissions.

The Court ruled that the question was not leading. The Court has a wide discretion with reference to whether or not to allow questions that are clearly leading and unless this Court can see that the question was not only clearly leading but clearly prejudicial, the action of the Court will not be interfered with by this Court; no prejudice could have resulted by any possibility here because in addition to the testimony of other witnesses, the defendant himself (R. 306) admitted that he had seen the little girl. The seventh assignment is accordingly overruled.

The eighth assignment complains that the Court refused to allow defendant's counsel to ask the defendant the following questions, and in refusing to allow the jury to hear the answer of the defendant to said questions, which were as follows:

"Q. Had Mr. Inman said anything to you about cutting sod there? Don't tell what he said if he said anything. A. Well, he never said anything per-

sonally to me about cutting sod but he talked to my uncle about it.''

The basis of this complaint is that said question and answer were relevant and competent to show the defendant's state of mind with regard to his flight from the State.

The jury was excused from the Courtroom while defendant's counsel was permitted to examine him further but, although having this opportunity to do so, counsel failed to show what Mr. Inman said, if anything, about cutting sod, except that he did not want them to cut it for anybody but him. Defendant had already testified (R. 307-308) without objection that they had orders that they would be prosecuted if they were caught trespassing in that way. Defendant had also testified that he ran away because two white men had appeared and told him to ''Halt.'' The assignment is overruled.

Assignments nine and ten complain of the alleged error of the Court in overruling defendant's objections to the Assistant Attorney General's cross-examination of defendant by repetitious questions and by alleged brow-beating of the defendant.

We have examined the record carefully and find no merit in these two assignments, and the same are overruled.

Assignment fourteen to the effect that there is a material variance between the indictment and the proof is overruled for the same reasons as was assignment thirteen, supra.

The fifteenth and last assignment of error is to the effect that the Court erred in overruling the defendant's motion for a new trial because it is alleged the jury conducted itself properly during its deliberations by engaging in speculations regarding the possibility or prob-

478

ability of parole in the case of life sentence, as shown by the return of the jury to the Courtroom about 30 minutes after retiring and the following question was asked of the Court:

"Q. Your Honor, we the jury would like to know if we can have information from the Court regarding the length of time a man must serve before parole is granted if a life sentence is recommended?"
To which the Court replied:

"Be seated. Gentlemen, the only instructions that cover your actions as jurors are embraced in the written charges which you have in your possession. Retire please, to your room."

Defendant further relies upon the affidavit made by his counsel, Z. Alexander Looby, in which he stated that after the jury had been discharged he, the said Looby, saw one juror, Rogers W. Sanders, talking to a newspaper reporter and overheard the juror say that the jurors had decided on giving the defendant a sentence of life imprisonment, but one of the jurors made the statement that the defendant would be paroled in eight or nine years and would be back again on the streets, as a result of which statement the jurors changed their verdict and voted to sentence the defendant to be electrocuted.

▌ No criticism is or can be made of the action of the Court in this case because it was strictly in accord with the ruling in *Porter* v. *State,* 177 Tenn. 515, 517, 151 S. W. (2d) 171.

Counsel relies on the reversal by this Court in *Williams* v. *State,* 191 Tenn. 456, 234 S. W. (2d) 993, where the Trial Judge erroneously and improperly undertook to respond to such an inquiry from the jury. That case is of no aid to counsel.

What we are really being asked to do is to act upon the affidavit of counsel that he overheard a juror make an unsworn statement to a newspaper reporter while counsel has not called this juror or any other jurors to testify under oath as to any alleged improper conduct that is supposed to have taken place in the deliberations of the jury. The circumstances under which a juror may or may not be examined with reference to the verdict are fully set out in *Lee* v. *State,* 121 Tenn. 521, 116 S. W. 881.

 The Trial Court was not in error in refusing to set aside the verdict and grant a new trial on this meager showing.

Finding no reversible errors in the proceedings below, the judgment of the Trial Court is affirmed. The defendant is ordered transferred to the State prison where the sentence of death by electrocution will be carried into effect on the first day of August, 1955, as the law directs.

NEIL, Chief Justice, and BURNETT, Justice, dissent.

MR. CHIEF JUSTICE NEIL (dissenting).

I respectfully dissent from the majority opinion as to the ruling of the trial court in the qualification and empaneling of jurors. I think it was reversible error for the court to permit the District Attorney General to state to prospective jurors what he expected to prove as evidencing the guilt of the defendant, and then ask each of them of they would agree to return a verdict imposing the death penalty. It is true that some of the jurors stated on their voir dire that whether or not they would sentence the defendant to death would depend upon the facts and the law as charged by the court. But regardless of this I feel that the examination of prospective jurors by the State's counsel was not only highly prejudicial but unlawful.

When the case was called by the clerk, and both the State and the defendant's counsel announced ready, the District Attorney General addressed the court as follows: (There were twelve prospective jurors then in the jury box to be examined on their voir dire).

"Mr. Smith: If your Honor please, and gentlemen of the jury, we have for trial this morning the case of the State of Tennessee versus John Arthur Hale, seated here; he is charged in the indictment, gentlemen, with the assault and battery on a female under the age of twelve years with the intent to carnally know her.

"Now, gentlemen, the facts briefly are that in the middle of the morning or shortly before noon on Saturday, October 17th, this defendant took little Linda Kay Killingsworth who at that time was eight years old and lived at 2993 South Wall Street, off Lamar, out close to the Non Connah Bottoms, he took her down into the Non Connah Bottoms into some wooded area there, at which time he raped her. The proof will show you that the rape was committed in her rectum."

He then read Section 10785 of the official Code, which provides that an assault and battery with intent to carnally know a female under the age of twelve years shall be punished as in case of rape. He then read the statute prescribing the punishment for rape, to wit, death by electrocution provided the jury may "if they think proper commute the punishment for the offense to imprisonment in the penitentiary for life or for a period of not less than ten years."

He then stated that the State was demanding the death penalty and asked each individual juror if he be-

lieved in capital punishment. Following this question he asked:

"Mr. Smith: If the state proves this man guilty of this offense, under the charge given you by the Court would you vote to convict him and fix his punishment at death by electrocution?"

He repeated the foregoing statement a number of times to prospective jurors, asking each and every one, "And you will vote to fix his punishment at death by electrocution?" To which there was an affirmative answer.

If any juror indicated his disbelief in capital punishment, or an unwillingness to impose the extreme penalty in the instant case, he was challenged for cause and was sustained by the trial judge. The following appears in the record:

"Mr. Smith: You would have some hesitancy, if you felt this was a proper case, to give the man the death penalty?

"Mr. Gurley: I am not sure about that at this time.

"Mr. Smith: You can't answer me whether you would vote to give him the electric chair if it was a proper case; you can't answer that yes at this time?

"Mr. Gurley: Not truthfully, I don't believe.

"Mr. Smith: If your Honor please, we challenge him for cause.

"The Court: Report back to the big jury room.

"(Mr. Gurley excused.)"

When twelve jurors had been examined, passed and tendered to the defendant, his counsel moved the court that the entire list of prospective jurors accepted by the State be disqualified for cause upon the following grounds: "In the first place, the Attorney General

purports to indoctrinate these men with certain facts when they should not have been given any facts until the witnesses get on the witness stand; in the second place it is up to the point where he was telling the jury those were the facts, and they have been indoctrinated even before selected, as to certain facts, and of course their qualification will be predicated on that statement in which the attorney general tells them facts; and it is our position and we contend they are not facts and will not be facts until we put competent witnesses on the stand to testify as to those, and it is improper in the selection of a jury to introduce those as facts, so that when witnesses are called, merely it will be corroborating what has been given to them as facts."

Secondly, "if your Honor please, every man qualified by the State has pledged himself in advance of the trial and in advance of hearing a word of evidence, he has pledged himself as to what sentence he will render." The objection was overruled by the trial judge and exception noted.

Under cross-examination by defendant's counsel answers were elicited to the effect that the death penalty would be imposed provided the evidence sustained the State's theory as had been outlined by the District Attorney General. As indicating the trend of the examination the court made the following inquiry:

"The Court: In other words, you are not, as the court understands you, making a statement at this time that if you find him guilty beyond a reasonable doubt, your only verdict would be the extreme penalty; that is not your statement, is it?

"The Juror: Well, that is what the state is asking for, isn't it?"

It furthermore appears that the defendant's counsel was not permitted to ask prospective jurors if their verdict would be less than death in the event "any proof develops mitigating circumstances". (Tr. pp. 91 and 92). The counsel stated in response to an objection by the District Attorney General that he was asking the question to find out if he should challenge the juror peremptorily. The foregoing is a summation of what transpired in the examination of jurors on their voir dire. The entire examination of jurors left no doubt in the mind of any of them that the State would not be satisfied with a verdict short of death by electrocution, and that it would be their duty to return such a verdict.

When the twelfth juror was passed by the State and tendered to the defendant he was compelled to take him because he had exhausted all of his peremptory challenges.

The examination of jurors covers 140 pages of the record. The procedure in my opinion has no precedent in this State.

It is undoubtedly true that the State's counsel has the right to state to any and all jurors before they are sworn to try a case that the death penalty will be demanded; also to ask if the juror is opposed to capital punishment. The fact that a juror does not so believe is recognized as a ground for "challenge for cause". But I know of no case in the judicial history of this State where the prosecution was ever permitted to ask a juror on his voir dire if he will agree to fix a defendant's punishment at death. The prospective juror answers that question under oath. In these circumstances it would be extremely difficult for a juror to enter upon a consideration of the case with an open mind as to the guilt or innocence of the accused and what penalty should be imposed.

I fully agree that the evidence in this case does not preponderate in favor of the defendant's innocence; it is doubtless the other way. He is under conviction of a heinous and revolting crime. But he is nevertheless entitled to be tried according to recognized rules of procedure; otherwise there is no safety in the law. I feel that a new trial should be granted.

Considering the fact that the death sentence is being upheld by a divided Court, the Governor would doubtless be justified in granting some measure of commutation.

Mr. Justice Burnett, (dissenting).

I find myself unable to agree with the majority opinion for the reasons hereinafter stated.

Hale was indicted and convicted for an assault and battery upon a child under 12 years of age with intent to carnally know her and was given the death sentence.

The 13th assignment of error on behalf of Hale complains of the trial judge's overruling the motion for new trial and assigns it is error because it is said that there was no evidence upon which the jury could find the defendant guilty of the offense charged in the indictment. The basis for this assignment is that the commission of the act of unnatural sexual intercourse by the plaintiff in error shows that he was not guilty of the act charged in the indictment because the act that he committed was only a commission of a crime against nature. I am convinced that this assignment should be sustained.

According to the majority opinion the record shows without dispute that the plaintiff in error penetrated the anus and not the vagina. As I read this opinion, and as I remember the argument, this act was committed some three times.

Clearly under the indictment in the case which is based upon Code Section 10785 ''the guilty intent is the gravamen of the charge and not the consummation of the intent.'' The majority opinion 281 S. W. (2d) on page 53. I think there is no question in the world but this is a correct statement of the law. The majority opinion cites in support thereof *Carter* v. *State,* 181 Tenn. 259, 181 S. W. (2d) 137; *Brown* v. *State,* 186 Tenn. 378, 210 S. W. (2d) 670; *Davis* v. *State,* 186 Tenn. 195, 198, 209 S. W. (2d) 7, and other authorities to support this statement.

It seems to me that the most plaintiff in error can be guilty of is a violation of Code Section 11184 which is the Section of the Code that makes it a crime for one to have sexual relations against nature with either mankind or beast and provides the maximum penitentiary sentence of 15 years. We have recently held that this Code Section covers acts of ''penetration per os'' and the clear inference from this is that this section likewise covers penetration of the anus. See *Fisher* v. *State,* 197 Tenn. 594, 277 S. W. (2d) 340.

The majority opinion quotes to some extent from the testimony in the record and reaches the inescapable conclusion that the evidence therein clearly shows the intent to have carnal knowledge. To my mind this conviction certainly should be sustained under the proof in this record if it were not for the final act which the plaintiff in error committed. The acts of intention to carnally know, I assume, must of necessity be the same acts that would necessarily be when a person committed an unnatural sex act as was done in the instant case by penetration of the anus. One to have carnal knowledge and to be guilty of the intent to do so cannot be convicted of this intent when the final act or the consummation of the intent shows that it was not to have carnal knowledge

but to have an unlawful and unnatural sex act. Of course I know that either is horrible and very revolting but the Legislature who passed these acts has seen fit to have a separate statute for these unnatural sex acts and when one has committed a violation of this act he should be punished therefor but he should not be punished for an offense which carries a much greater penalty. The intent to have carnal knowledge is negatived by him doing the act that he did. It seems to me that when a crime is accomplished that this within itself shows the intent to do whatever act was started out to be done. The doing of the act that was done shows what the intent was. When an act has been accomplished whatever the intent was the mere accomplishment of the act shows what that intent was. The accomplishment of one crime negatives the intent to do a different crime.

I think it is necessary under the question that I have raised here for us to look to the definition of intent, especially since intent is the gravamen of the crime for which the man was here convicted. In 46 C. J. S. at page 1103 intent is thus defined:

"A design; a determination to do a certain thing; an aim; the purpose of the mind, including such knowledge as is essential to such intent; an intending or purposing; an intention; a purpose; that which is intended; the design, resolve, or determination with which a person acts.

"Intention is an emotion or operation of the mind; a mental attitude made known by acts; the state of mind with which an act is done or contemplated; and has been defined as the tendency imputed by law to an act; the voluntary purposing of an act; and volition. It implies premeditation and purpose."

(Intention is) "a settled direction of the mind toward the accomplishment of a particular act; [citing cases from many jurisdictions] a determination to act in a certain way or to do a certain thing." *State ex rel. Verbon* v. *County of St. Louis,* 216 Minn. 140, 12 N. W. (2d) 193, 196, 46 C. J. S. p. 1105.

This Court in the case of *Smith* v. *State,* 2 Lea, Tenn., 614, 619 said of intent.

"It is the exercise of intelligent will, the mind being fully aware of the nature and consequences of the act which is about to be done, and with such knowledge and with full liberty of action willing and electing to do it.

"Intent is a mental condition and is determined, not so much by what one says, as it is by what one does." *Detroit Trust Co.* v. *Hartwick,* 278 Mich. 139, 270 N. W. 249, 253.

The state of mind which precedes or accompanies an act is the intent. *Williams* v. *State,* 113 Neb. 606, 204 N. W. 64, 66; *Crosby* v. *Wells,* 73 N. J. L. 790, 67 A. 295, 302.

Intent "can usually be shown only by acts, declarations, and circumstances known to the party charged with the intent." *Hooker, Corser & Mitchell Co.* v. *Hooker,* 103 Misc. 66, 170 N. Y. S. 570, 573.

In other words in all legal definitions of the word intent or intention when used in the sense that it is here used clearly leads me to the conclusion that since the man accomplished the act that he did accomplish that any inference or facts which might lead to another accomplishment are clearly negative and should be sufficient to show us that he did not intend to carnally know this child.

In *Hooks* v. *State,* 154 Tenn. 43, 289 S. W. 529, the late Chief Justice Green reversed a conviction in which

Hooks was indicted for attempting to break in a house and to have carnal knowledge of a female against her will. The basis for this reversal was that the acts there of Hooks clearly negative the intent to have carnal knowledge of this woman against her will. It was Judge Green's reasoning that the record clearly showed that he was going to try to persuade this young lady to commit the act and not do it against her will. In other words that case clearly showed that by the acts of Hooks that he did not intend to use force. It seems to me that in the instant case that by the accomplishment of the act that the plaintiff in error here did on three occasions at this time, that is, of penetration of the anus, plainly and outspokenly negatived that the acts of intent which clearly could convict the plaintiff here if it was not for the accomplishment of a related crime which clearly negatives the intent to carnally know. See Wharton's Criminal Evidence, Vol. 2, Sec. 1038, page 1824. Frankly I have been unable to find any authorities directly in point. But the question obviously, is to me, so plain that it has never arisen. The only place the question could arise would be in the weight that the court gives to the evidence and here when the evidence of intent is plain but that intent which could be one of two things, as shown by the accomplishment of a certain act, it clearly negatives and takes away the intent to go to the jury to carnally know. It is for this reason that I think the case should be reversed and remanded so that the plaintiff in error may be indicted for the crime which he has commited.