FREDDIE GREEN

*v.*

STATE OF TENNESSEE.

375 S.W. 2d 647

(*Nashville,* December Term, 1961.)

Opinion filed February 8, 1962.

HUGH STANTON, J. F. ESTES, Memphis, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, WALKER T. TIPTON, Assistant Attorney General, for defendant in error.

166

Mr. Justice White delivered the opinion of the Court.

Green's appeal is from a conviction of murder in the first degree of Sharon Fanny Vaiden while attempting to rape her. His punishment is fixed at death by electrocution. Green was about nineteen years old at the time of this offense.

While there are several assignments of error, the brief filed for Green frankly conceded his guilt, but complains that the Trial Court erroneously limited cross-examination of the medical experts. The contention of defendant's counsel seems to be that the cruelty with which he acted in committing the crime entitled the jury, if it so desired, to mitigate the punishment, but that the Court erroneously excluded answers to questions which the jury should have had to decide whether or not the punishment should have been mitigated. Due to this insistence, the facts of the case will be recited.

On the night of February 18, 1961, the victim, Sharon, a thirteen year old girl, went with her mother to Weingarden Food Center in Memphis. During the course of her shopping, the mother noticed the absence of Sharon. A failure to promptly find her caused an intensive search.

The child was found dead in the sub-basement of the store. She had been stabbed thirty-four times. Her body rested on a pile of sawdust. A pillow, rubbish and some discarded pieces of furniture had been thrown over her body. Her skirt had been pulled up to her waist. One leg of her panties had been pulled from her leg.

Above this sub-basement is the basement in which are the toilet booths, and in which are, among other fixtures, washbasins and commodes.

Green was found at an early hour the next morning by the city police. At the police station, according to the testimony of the police, he first stated that he had helped an unidentified white man commit the crime. But he subsequently stated to the police that he previously had had sex relations in this store with that girl, and with her consent and co-operation. Green, when testifying in his own behalf, denied this indirectly by testifying that he had never seen this girl until the night the murder occurred.

Green's testimony as to the commission of the crime is that as he was cleaning the washbowls in the booths and finished that job, he turned back towards the steps leading to the steps which go up to the main floor to clean the commodes in the first basement booths. Then it was that he saw this girl in one of the ladies toilets with her dress pulled up to her waist and that ''I don't remember nothing after that''; that he had had that type of feeling before.

In his prior oral statement to the police on Sunday morning, so they testified, he told them that on the night of the crime he saw a white boy having sexual relations

with this girl in this particular booth; that after the white boy left, he opened the door to this toilet where she was rearranging her hair and clothes; that she then refused to kiss him; that he then pulled her into the sub-basement, and "she started hollering" and he started sticking her, and he pulled one leg out of the pants "with intention of having relations" but noticing that she did not move, he pulled her over on the sacks of sawdust an left; that a little later he noticed police approaching the store, so he left through the sub-basement.

The entrance from the outside to the sub-basement is through a seldom used door, the key to which is kept in a glass jar. On this night that jar was broken, and the key in question was not in the jar. This testimony is not noticed by him in his testimony, but the "white boy" is named by him to be Patterson. Patterson, brought to the police station, denied the story in toto in so far as it involved him.

Outside, but in the close vicinity of this super market, there was found on the grass a pocket knife with type O human blood thereon. Sharon, the murdered girl, had that type of blood. Green admitted the ownership of that knife or one like it. He never produced any knife at the trial.

A negro was noticed running from the rear of the store, while the heretofore mentioned search for the girl was taking place. The manager checked the forty (40) employees, and found Green to be gone. He had not checked out, as was the requirement as to all employees. Not far from the store the defendant was passed by a car in which were a couple of his friends. He rode with them a short distance, alighted, walked to the home of a

nearby friend, and sought asylum for the night, with the statement that he was in serious trouble. His request being refused, he took refuge there in a car in the yard; covered himself with the seat, and other material therein. In such place and condition he was found asleep by the police early Sunday morning.

While there is other evidence of guilt, it need not be noticed. That above recited is far more than sufficient to justify beyond per-adventure of doubt that Green committed this cruel and atrocious crime.

This brings consideration of this case to the question made in behalf of Green, to-wit, whether the Trial Court erroneously refused a complete cross-examination of the experts on the question of whether these acts of defendant did, in the opinion of these experts, or any of them, indicate such lack of appreciation by Green of right from wrong as to justify a jury to mitigate the punishment.

It appears to the Court that such proposition is actually an insistence that the more atrocious the crime, the more the jury will be justified in mitigating the punishment which it may fix. If this be so, then such a rule of law is an anomaly. The Court finds no authority to support such a position as evidence of the lack of sufficient reason to know right from wrong. And that is, of course, the test. Moreover, and without repeating details, the testimony in the record establishes conclusively that Green did know right from wrong.

In the second place, the evidence in this case does show that these specialists were informed of the facts of the case, but were of the opinion that Green knew right from wrong. And this after they had very thoroughly

examined Green, and had had him under observation for several days.

A substantial while before the trial, Green, upon his own motion, was transferred to Gailor Hospital for evaluation as to his mentality upon the point now under discussion. The examination was very thorough, both mentally and physically. Each of the doctors found Green was sane and knew right from wrong, and so stated in the written report submitted to the Trial Judge as directed by that Court's order. They were not called as witnesses by either Green or the State, though each knew of this report. Nor was the report, or its contents, made known to the jurors.

When the State rested its case, it was moved in behalf of Green that these three doctors be summoned as witnesses of the Court to the end that they be cross-examined by Green as to his ability to distinguish right from wrong based on the nature of the crime as committed by him.

The Court expressed the opinion that such a procedure would be a new experience for him, and doubted its legality under the circumstances. The Court did suggest that if defendant desired, he might summon these specialists as his witnesses. His lawyers rejected the suggestion on the ground that this would prevent cross-examination. Perhaps the heretofore mentioned report suggested this idea, but there was no evidence of the slightest hostility upon the part of these doctors to Green. Nevertheless, Green's attorneys so persisted upon the legal accuracy of their motion that the Court finally granted it.

Then followed the cross-examination by Green's attorneys of each. That examination was extra-ordinarily

persistent. And the Court was patient far beyond the call of duty.

It is a fact that time after time, and at a length which required very many pages, a question was asked by this defendant's attorneys directed to the effort of procuring an opinion from these doctors as to the insanity of this defendant, based upon the conduct of which the evidence established Green of being guilty in murdering this girl. Each time, however, the attorney, in his zeal to do what he could for his client, made his question incompetent because it did not stop with the single issue, to-wit,—whether under all the circumstances, the defendant was capable of knowing and realizing right from wrong.

For instance such phraseology as this was used in the questions,—"normally mentally",—"lost his contact with reality", and other similar statements.

Finally, the Court said to the attorney that:

"I believe you can sum this up very simply here by simply asking the doctor a hypothetical question and then put a cracker on the end of it, *'under these* circumstances would he know right from wrong.' "

The question following did not comply with the suggestion of the Court.

Further, this record, in this Court's opinion, discloses clearly that each of these well qualified specialists understood what the attorney for Green, by the questions he asked, was seeking, and that each of these specialists was of the opinion that such conduct did not justify an opinion that Green did not know right from wrong. For instance these questions were asked and answers given:

"Q. In view of the fact that this little girl was stabbed thirty four times in the wake of a sexual advance which had been rejected, do you think that would indicate that this boy knew right from wrong at the time that happened or that he did not.

A. In my opinion, he knew right from wrong at the time.

Q. At the time of the alleged assault.

A. Yes, sir."

Another of these specialists testified:

"I would not proceed to form an opinion about the individual's ability to know the difference between right and wrong on the basis of the number of stab wounds that occurred in this case."

All in all, this Court must conclude that the evidence establishes beyond a doubt that Green knew right from wrong when he so cruelly murdered this girl. This Court thinks it would be inconsistent with reason to hold otherwise. Another brutal murder case cited by the Attorney General is that of *Porter v. State,* 177 Tenn. 515, 151 S.W.2d 171.

All assignments of error are overruled. The judgment of the Trial Court is affirmed and will be executed on 12th day of April, 1962 by the official charged with that duty.