IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 5, 2013

## STATE OF TENNESSEE v. KELVIN WINN

**Appeal from the Criminal Court for Shelby County**
**No. 09-04902     James C. Beasley, Jr., Judge**

_____

**No. W2011-02568-CCA-R3-CD - Filed May 2, 2013**

_____

The defendant, Kelvin Winn, was convicted by a Shelby County Criminal Court jury of first degree felony murder and sentenced to life imprisonment. On appeal, he argues that: (1) the trial court erred in denying his motion to suppress the identification of him from a photographic array; (2) the trial court erred in allowing a jailhouse informant to testify without limitations; (3) the trial court erred in allowing the State to lead witnesses over his objection; (4) the trial court erred in allowing the introduction of duplicative photographs; and (5) the evidence is insufficient to sustain his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Paul K. Guibao (on appeal) and Larry Copeland (at trial), Memphis, Tennessee, for the appellant, Kelvin Winn.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Reginald Henderson and Kirby May, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the attempted robbery and shooting of the store clerk, Abdallah "Zack" Assaedi, at Sam's Food Market in Memphis on November 21, 2008, for which the defendant was charged with one count of first degree felony murder.

**State's Proof**

Faheid Alsidi testified that the victim was his brother, and he was notified on November 21, 2008, that his brother had been shot and killed.

Dr. Marco Ross, a forensic pathologist with the Shelby County Medical Examiner's Office, testified that he performed the autopsy on the victim. Dr. Ross noted that the victim suffered a gunshot wound to his left upper eyelid, with the bullet perforating the skull in the brain, which he determined to be the cause of death.

Sergeant Andrew Brown with the Memphis Police Department testified that he was assigned to uniform patrol the day of the shooting and was dispatched to the scene. When he and his trainee partner arrived, Sergeant Brown met with three witnesses who said that the store clerk had been shot. He went behind the counter and felt that the victim had "a very light pulse." He secured the scene and talked briefly with the witnesses before separating them to insure "the integrity of their information." None of the witnesses could identify the shooter or provide any descriptive information aside from a description of the clothing the shooter was wearing.

Myron Jones testified that he was a graduate student living in Memphis at the time of the shooting. He went to Sam's Food Market the morning of the shooting to purchase a newspaper and some food, and two other customers were in the store at that time. An individual wearing a Halloween mask came into the store, ran up to the front counter, and said, "It's a robbery . . . ." As the victim raised his hands, the gunman shot him in the head, and Jones dropped to the floor. The gunman then demanded money from Jones, and Jones gave him the two five-dollar bills in his hand. When the gunman stepped behind the counter to go to the cash register, Jones got up and ran out of the store to his home. Jones talked to his pastor and then called the police and later gave a statement. Jones identified portions of the surveillance video and still photographs taken from the footage. On cross-examination, Jones said that he only got to look at the gunman for "a minute[] or two" and that his face was covered with "a Halloween mask with slits over his eyes." In looking at one of the photographs, Jones noted that the gun was in the gunman's left hand. However, he acknowledged that he had incorrectly stated in his statement to the police that the gun was in the gunman's right hand.

The video showed the suspect approach Sam's Food Market but stop in the alcove next to the entrance for several minutes. The masked man then entered the store, shot the victim, took cash from Jones, tried to open the cash register, and fled the scene. Still photographs taken from the video detailed that the man was wearing dark clothing, a mask, and white gloves and that he shot the victim with a gun held in his left hand.

-2-

Joseph Mario Williams testified that he worked at Sam's Food Market in November 2008. On the morning of November 20, the day before the shooting, Williams and the victim were working in the store, and Williams started to exit the store to clean up the grounds outside. As he was walking out the front door, Williams noticed "a guy with a dark sweater, or coat on, and he had the hood up, he had his hands in his pocket and his head down. . . . [H]e lift[ed] up his head and he had a mask on." When the masked man saw Williams, he turned around and walked away from the store. The mask was clear plastic, allowing Williams to discern that the man was African-American, and had a "smiley face on it." Williams estimated that the man was 5'8". He called the police and reported the encounter that day.

Williams testified that, the following morning, he arrived at the store shortly after 7:00 a.m. He was working in the deli area around 8:30 when the robbery and shooting occurred. As he was hiding after the shooting, Williams observed that the gunman was the same man who had been at the store the previous day, noting he had on "[t]hat mask, the clothing, same clothing, hood on and that mask, that clear mask with that smiling face on it[.]" He saw the man trying to open the cash register. When the register would not open, the man stepped over the victim's body, picked up some money off the floor, and ran out of the store. Williams identified portions of the store's surveillance video and still photographs taken from the footage in his testimony.

Patricia Jean testified that she lived next door to Sam's Food Market at the time of the shooting and was walking to the store around 8:30 a.m. on the day thereof. As she passed an alcove between her house and the store, she noticed a man wearing a black hooded sweatshirt, jeans, and black shoes sitting in the alcove with his hands in his pockets. She was only able to see the front part of the man's face because he had his hood up, but she saw that he had a "little spot," such as a birthmark or freckle, on the right side of his face. The man asked her for a quarter, to which she responded that she would see if she had one when she returned from the store.

Jean testified that she went in the store and saw Williams, the victim, and a man she knew as "Brother." When she came out and passed the alcove, the man again asked her for a quarter, but she told him that she did not have one. She said that the second time, the man "raised his head up a little bit more, so [she] could see a little bit better, but that's it. Everything else [wa]s the same." She returned to her house after talking to a friend, and the police arrived a couple of hours later to investigate the shooting at the store. Jean was taken to the police station, where she spoke with Sergeant James Terry Max and relayed her encounter with the man outside the store. After giving her statement, Sergeant Max gave her a ride home from the station, during which she recalled the birthmark on the man's face and told the officer that she could identify the man who asked her for money.

During the course of the investigation, officers showed Jean five different photographic arrays, on November 24, 2008, two on November 29, 2008, January 9, 2009, and January 11, 2009, each containing six pictures. Jean did not observe the individual who had asked her for money in any of the first four arrays; however, she was able to make an identification from the final array. Jean identified the defendant in court as the man she spoke with outside of Sam's Food Market the morning of the shooting.

Jean also identified portions of the store's surveillance video and still photographs taken from the footage in her testimony. She identified herself and the man who asked her for money in several stills, including one that showed the man entering the market wearing gloves within the minutes preceding the shooting.

On cross-examination, Jean admitted that the only person in the final photographic array with a mole, birthmark, or freckle on the right side of his face was the defendant and that she received a $1,000 CrimeStoppers' tip after making an identification. However, she was not apprised that she would receive money for making an identification until after she had already identified the defendant. Jean admitted that when the man outside the store asked her for a quarter, she kept walking and did not stop to talk to him, explaining that she talked to him while looking over her shoulder as she continued to walk. She estimated that she talked to him for less than a minute on her way in and out of the store.

Officer Ricky Davison with the Memphis Police Department testified that he worked as a crime scene investigator at the time of the incident and, in such capacity, photographed and processed the scene along with his partner, Officer Jones. Officer Davison identified numerous photographs of the scene, taken from various locations inside and outside the store, as well as sketches he made of the area.

Officer Darnell Gooch with the Memphis Police Department testified that he was directed to a residence by homicide investigators on January 10, 2009, to get information from the defendant so he could be contacted in the future. Officer Gooch noted that the defendant wrote down his name, birth date, and social security number using his left hand. Officer Gooch recalled that the defendant's hair was "in braids, going to the back and it was kind of short above the collar."

Sophia Lessure, a deputy court clerk and keeper of records for Shelby County General Sessions Court, testified that both the defendant and Antonio Johnson were scheduled to be in General Sessions Division 12 on February 6, 2009.

Trinika Meredith, with the Shelby County Sheriff's Office, testified as keeper of records to the dates and locations that the defendant and Antonio Johnson were housed in

the Shelby County Jail. From February 6, 2009 until February 11, 2009, the two were housed on the second floor, a floor designated for inmates with medical conditions, in the same pod. The two were allowed out of their cells for six hours every day, along with other inmates of the pod level. On February 11, 2009, Johnson was moved to the fourth floor but returned to the second floor on February 13, again in the same pod as the defendant, where they both remained until March 4, 2009.

Antonio Johnson, who acknowledged a rather extensive criminal history, testified that he contacted the Memphis Police Department on February 12, 2009, to give them information concerning the defendant. He explained that he met the defendant in court on February 6, 2009, and the defendant "was just blabbing off at the mouth about what was going on." The defendant was moved into the same pod as him later that night and begun discussing the details of his case with Johnson.

Johnson testified that the defendant told him that, in November 2009, he went to a store to commit a robbery but was unable to because "he was detoured by some people." The second time, the defendant went in with his gun in hand, demanded money from the cash register, and shot the clerk in the face. The defendant said that there was a customer in the store who "fell to the ground" upon seeing the defendant, and the defendant took money from him before fleeing the store. The defendant told Johnson that he was wearing a "black hoody, some gloves, [and] some black Gucci pants" and that his hair was "in a little Afro like then, or in braids" at the time of the robbery and shooting. The defendant also indicated that he wore a mask.

Johnson testified that he contacted the homicide bureau and eventually spoke with Sergeant Max. He said that he had an occasion to talk to the defendant again, after which he wrote down a few notes, and the defendant told him that his brother dropped him off at the store prior to the incident in a four-door, white 1999 Mercury. Johnson assisted the defendant in trying to contact his brother "to use him as an alibi." On February 12, 2009, he was shown a photographic array, from which he identified the defendant. Johnson stated that he was not prompted by the police or anyone in the prosecutor's office to obtain incriminating statements from the defendant.

On cross-examination, Johnson testified that the day after he spoke to Sergeant Max, he was moved to general population on the fourth floor of the jail. When he got a chance to the use the phone, he called Sergeant Max to see if he was able to get him moved back to the second floor because he believed that his "life was in jeopardy in that pod, because [the defendant] was affiliated with the G[angster] D[isciples]." However, he had no expectation that he could receive a favor from Sergeant Max. Johnson said that it was his idea to take notes of his second conversation with the defendant, and his getting moved back

to the second floor was not a "favor for . . . taking the notes." Johnson acknowledged that he was taking several prescription drugs, including one for hallucinations, at the time of his conversations with the defendant.

Sergeant Eric Freeman with the Memphis Police Department testified that, on January 13, 2009, Sergeant Max, the lead investigator on the case, requested that he look for a white Mercury Sable. The car was parked in front of 1620 Pennsylvania Street and was owned by Linda Winn.

Sergeant James Terry Max with the Memphis Police Department testified that he responded to the scene at 10:30 a.m. on November 21, 2008, and served as the lead investigator on the case. Officers downloaded the video from the store's surveillance system. The video from the outdoor cameras showed an individual "walking . . . towards the store. The subject walked into a little alcove, a little covered area, where he was out of view. And . . . at least[] two customers walk[ed] by the subject and actually look[ed] at the subject." They determined who the two customers were who talked to the subject and interviewed them. One of the customers, Patricia Jean, relayed that the subject was sitting down, wearing all dark clothing and a hoody pulled over his head, and had his hands in his pockets the entire time. Jean told Sergeant Max that she saw the subject's face and thought she could identify him. Sergeant Max gave Jean a ride home from the station, and during the drive, Jean told Sergeant Max that the man had a freckle, birthmark, or mole on his face. The other customer, Dallas Jackson, said that he could not identify the individual because he did not get a good look at his face.

Sergeant Max testified that he made still shots from the surveillance video and distributed them to the "different precincts and the task force" to see if anyone had information on the "masked and gloved" subject. Various suspects were developed through CrimeStoppers' tips and information from other sources. Over the course of the investigation, Jean was shown four photographic arrays, containing suspects developed from such tips and sources. She did not recognize the subject she saw outside of Sam's Food Market on November 21 in any of the arrays.

Sergeant Max testified that the defendant was eventually developed as a suspect after his name came up in an unrelated investigation and an officer noticed that he matched the description of the gunman at Sam's Food Market. Based upon the surveillance video showing that the gunman was left-handed, Sergeant Max sent an officer to find the defendant and have him write down his contact information in order to see which hand he wrote with. The officer observed that the defendant wrote with his left hand.

-6-

Sergeant Max testified that he created a fifth photographic array, this one containing the defendant's picture. Because the defendant had an obvious birthmark on his face, he attempted to find other individuals who had "distinctive markings on their face[s]," and those placed in the array bore some sort of discoloration or obvious anomaly in their complexion. The array was shown to Patricia Jean on January 11, 2009, and, within three seconds, she identified the defendant as the man she spoke with outside Sam's Food Market the morning of the shooting.

Sergeant Max testified that, when the defendant was arrested and questioned, he denied any involvement in the robbery and shooting. The defendant claimed that he was in Tunica, Mississippi, around Thanksgiving 2008, as he and his brother had gone there to visit their cousin, Yolanda Winn. The defendant was not sure of the exact date he went to Tunica but recalled that he returned to Memphis on Thanksgiving Day. The defendant told Sergeant Max that his mother and girlfriend could verify that he went to Tunica. However, Sergeant Max was unable to verify the alibi, as those he questioned were "[v]ery vague, very vague, no dates. . . . No[] one could get [him] the exact date and time frame." The defendant later requested to speak with Sergeant Max again and, during the conversation, claimed that his brother actually committed the crime.

Sergeant Max noted that they received information that the suspect "had possibly gotten out of a white four-door, like, Pontiac Sunfire type vehicle," and it was later confirmed that the defendant's mother owned a four-door, white 1999 Mercury Sable. In addition, on February 12, 2009, Antonio Johnson, an inmate in the jail, called and provided the same information as he testified to above, which Sergeant Max determined to be credible.

**Defendant's Proof**

Yolanda Winn, the defendant's cousin, testified that she picked up the defendant at a liquor store in Memphis on November 17 or 18, 2008, and took him to stay with her in Tunica for "a couple of weeks." On November 20, during that two-week period, they went back to Memphis for the defendant to get "some emergency food stamps" but returned to Tunica the same day. Winn explained that the defendant does not drive because he has an eye problem. Her sister, Latonya Murrell, brought the defendant back to Memphis "[a]round the 27th."

Jerold Conley testified that he was outside Sam's Food Market on the morning of November 21, 2008, and did not recall seeing anyone other than Patricia Jean and Dallas Jackson.

Dallas Jackson testified that he was present at Sam's Food Market on the day of the shooting. He recalled speaking to someone who was sitting in the alcove outside the market, but he could not see the man's face and was therefore unable to make an identification when shown a photographic array. He was able to discern that the man "was very dark in complexion."

Linda Winn, the defendant's mother, admitted that she owned a white 1999 Mercury Sable. She said that the car was "running hot" and needed a water pump at the time of the offense; therefore, it was parked in her carport and no one was driving it.

Latoya Winn, the defendant's sister, testified that she had a baby on November 20, 2008, and that the defendant did not visit her because he was out of town.

Lakeshia Atkins testified that she saw the defendant on November 21, 2008, in Memphis when the defendant was in town to get food stamps, but she could not recall what time of day she saw him. She and the defendant's brother, Robert Sutton, went to the hospital that same day to visit Latoya Winn, and Sutton was driving his mother's white Mercury Sable, despite it "running hot."

Keith Sutton, the defendant's brother, testified that Lynette Villalpando and Patricia Jean were at his house sometime in the summer of 2009. Jean saw a picture of the defendant, and she commented that he was handsome and did not state that she had identified him "as being a killer."

Lynette Villalpando testified that she was a friend of the defendant's family and was with Patricia Jean at the defendant's mother's house sometime in 2008 or 2009. She recalled that Jean saw a photograph of the defendant and commented that he was handsome. Villalpando found Jean's comment odd "[b]ecause here you accuse a man of murder, but you can't remember his face and what he looks like."

Dr. Jeffrey Newschatz testified as an expert in eyewitness identification concerning the issues and concerns with eyewitness identifications, including the one in this case.

Following the conclusion of the proof, the jury convicted the defendant, as indicted, of first degree felony murder.

## ANALYSIS

### I. Photographic Identification

-8-

The defendant argues that the trial court erred in denying his motion to suppress Patricia Jean's photographic identification of him as the man she saw outside of Sam's Food Market immediately before the robbery and shooting. He asserts that "[d]ue to the unique appearance of the [defendant]'s birthmark, the police were compelled . . . to create photo lineups containing individuals with similar such marks on their faces, consistent with the information provided by witness Jean, in order to avoid tainting the identification process."

On appeal, a trial court's findings of fact regarding a motion to suppress are conclusive unless the evidence preponderates against them. State v. Reid, 213 S.W.3d 792, 825 (Tenn. 2006) (citing State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001)). Any question about the "credibility of witnesses, the weight and value of the evidence, and a resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, unless the defendant demonstrates that "the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court." Reid, 213 S.W.3d at 825 (citing State v. Cribbs, 967 S.W.2d 773, 795 (Tenn. 1998)). However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). In Neil v. Biggers, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Id. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Id. (internal quotations omitted); see also Stovall v. Denno, 388 U.S. 293, 302 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. See Biggers, 409 U.S. at 199-200. The corrupting effect of

the suggestive procedure is weighed against these factors. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in Biggers if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. See State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

"Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from 'suggestive identification procedures.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Biggers, 409 U.S. at 196). Accordingly, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" Id. (quoting Stovall, 388 U.S. at 301-02). The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Simmons, 390 U.S. at 383.

At the suppression hearing, Sergeant Max testified as to the creation of the photographic array from which Jean ultimately made an identification. He said that Jean advised that the man she saw had "a birthmark or some kind of discoloration area on his face." He maintained that all the individuals placed in the array had some type of discoloration or imperfection on their faces and that the goal in creating an array is "to make them similar and like."

After hearing the testimony and argument of the parties, the trial court denied the defendant's motion to suppress. In doing so, the trial court noted that each individual depicted had some sort of unique mark or discoloration on his face. The court did not find that any of the photographs in the array were "so grossly dissimilar from [the defendant] as to attract the attention of Ms. Jean and immediately draw her attention to [the defendant] in an unconstitutional violation of [the defendant]'s due process rights."

Upon review of the photographs in the array, we cannot conclude that the defendant's photograph was "grossly dissimilar" to the others. State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing United States v. Wade, 388 U.S. 218, 233 (1967), for the proposition that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar"). The testimony indicates that the officers spent five

hours creating an array of individuals "similar and like" to the description given by Jean. The array includes color photographs of six African–American males, each with some type of imperfection, mark, or discoloration on his face. In viewing the array, Jean was told that the perpetrator may or may not be depicted and was advised not to select anyone unless she was positive of the identification. Even though none of the exemplars besides the defendant has a birthmark on the right side of his face, as noted above, our supreme court has previously ruled that the "[p]hotographs contained in a photographic array do not have to mirror the accused." Hall, 976 S.W.2d at 153. In sum, we cannot conclude that the photographic identification was unnecessarily suggestive. The defendant is not entitled to relief on this issue.

## II. Informant Testimony

The defendant argues that the trial court erred in allowing jailhouse informant, Antonio Johnson, to testify without limitations. He alleges that Johnson was recruited by law enforcement officers to elicit statements from him and was thus "acting as an arm of the state for the purpose of interrogating [him]."

A defendant's Sixth Amendment right to counsel attaches when the adversarial judicial process has begun. Montejo v. Louisiana, 556 U.S. 778, 786 (2009); Brewer v. Williams, 430 U.S. 387, 401 (1977); State v. Rollins, 188 S.W.3d 553, 565-66 (Tenn. 2006). "[T]he clear rule of Massiah [v. United States, 377 U.S. 201 (1964),] is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Brewer, 430 U.S. at 401 (footnote omitted). In Tennessee, the adversarial judicial process is initiated upon the filing of the formal charge, which includes the arrest warrant, indictment, presentment, or the preliminary hearing in cases in which a warrant was not obtained prior to the defendant's arrest. See Rollins, 188 S.W.3d at 566; State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980); State v. Jackson, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993).

> Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

Maine v. Moulton, 474 U.S. 159, 170-71 (1985) (footnote omitted). "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." Id. at 176. Thus, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." Id. Accordingly, any statements made by the defendant to a fellow prisoner after he had been recruited by the State would be inadmissible; however, any admissions made by the defendant to a fellow prisoner before law enforcement becomes involved are admissible. See Hartman v. State, 896 S.W.2d 94, 100 (Tenn. 1995).

The evidence shows that the defendant told Johnson information about the shooting, and Johnson, on his own accord, took that information to Sergeant Max on February 12, 2009, and gave a statement relaying what the defendant had told him. After giving the statement, Johnson informed Sergeant Max that he had been moved from the medical floor of the jail to the general population floor the day before and asked if Sergeant Max could get him returned to the medical floor because he felt that his life was in danger on the general population floor since the defendant was a gang member. Sergeant Max told Johnson that he could not promise him anything but that he would make a phone call to see if he could get moved. Sergeant Max called the chief jailer the next morning and learned later that day that Johnson had been moved back to the medical floor. On February 16, Sergeant Max learned that Johnson had called wanting to speak to him, so Sergeant Max brought him up from the jail to talk to him a second time. Evidently, Johnson had spoken with the defendant again and had written down notes from their conversation. The majority of the information was the same as that relayed in Johnson's first statement, but some new details were provided.

In a hearing regarding the matter, Johnson testified that, after his first meeting with Sergeant Max, Sergeant Max did not tell him to do anything when he returned to jail. He said that Sergeant Max did not tell him to get more information from the defendant, write down notes of anything the defendant told him, or promise him anything if he got more information from the defendant. Sergeant Max testified that he did not ask Johnson to try and get more information from the defendant, explaining that he knew that if he had, Johnson would be acting as an agent of the State and the information obtained would be illegal. He said that he asked about getting Johnson moved back to the second floor only "because he had helped us out."

In ruling on the issue, the court determined that it saw nothing in the proof to indicate "that Sergeant Max planted Mr. Johnson back on the second floor with the intent and the

-12-

instructions to gather more information from [the defendant]." The court was convinced from Johnson's and Sergeant Max's testimony that Johnson obtained information from the defendant "on his own, both times, without any instructions from Sergeant Max." The court observed that there was no evidence to counter Johnson's testimony that he only took notes the second time because "he wanted to write down as much as he could write down, as much as he could remember[.]" The court noted that Johnson and Sergeant Max could be cross-examined about Johnson's being moved back to the second floor, "as to judging Mr. Johnson's credibility." The court concluded:

> I don't find, based on the proof . . . that there was any violation of [the defendant]'s right to privacy. His right to not give information incriminating himself, that was violated by members of the police department, by planting an informant . . . with the intent and desire to gather improper and illegal information from [the defendant].

Upon review, we conclude that the evidence supports the trial court's determination. Both Johnson and Sergeant Max testified that Johnson spoke to the defendant the second time on his own accord and that Sergeant Max made a call to see about getting Johnson returned to the second floor of the jail as a favor for coming forward with information, not to act as an informant for the police department. There is nothing in the record to contradict this testimony to show that Sergeant Max knowingly circumvented the defendant's right to counsel. The defendant is not entitled to relief on this issue.

### III. Leading Witnesses

The defendant argues that the trial court erred in allowing the State to lead witnesses over objection by defense counsel. With no citation to the record, the defendant makes the broad claim that "[t]hroughout the course of trial, Defense Counsel objected to the State's repeated leading of witnesses during direct examination." He asserts that "[t]his is prejudicial on its face, as it allows the [S]tate to testify and narrate the course of events in a light most favorable to its position without allowing the true character and nuance of the witness's own perceptions to reach the jury."

We note that the defendant raised the issue concerning leading questions in his motion for new trial. However, he did not provide a transcript of the hearing in the record on appeal for this court to review the trial court's analysis of the issue, although the record includes a written order denying the motion for new trial after a hearing.

In any event, our review of the record shows that defense counsel made approximately twelve objections to leading over the three days of testimony. Each of those

times, except one that was overruled, the trial court sustained the objection and the State complied. Tennessee Rule of Evidence 611(c)(1) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony." The Advisory Commission Comments to the rule note that Rule 611(a) "recognizes the inherent power of a court to control trial conduct to prevent lawyers from abusing the process." Under Tennessee law, the trial judge has wide discretion in controlling leading questions, and unless the question was not only clearly leading, but also clearly prejudicial, this court will not interfere with the action of the trial court. Mothershed v. State, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978). The defendant has not shown an abuse of the trial court's inherent power, nor do we find that the State's use of leading questions prejudiced the verdict in this case. See Hale v. State, 281 S.W.2d 51, 58 (Tenn. 1955); Mothershed, 578 S.W.2d at 99; State v. Bobby Gene Keck, No. 01C01-9401-CC-00017, 1997 WL 254228, at *13 (Tenn. Crim. App. May 16, 1997), perm. app. denied (Tenn. Mar. 2, 1998). The defendant is not entitled to relief on this issue.

## IV. Photographs

The defendant argues that the trial court erred in allowing the introduction of duplicative photographs. He does not direct his argument to any particular photographs and simply asserts that "the State was permitted to enter cumulative, prejudicial, and gruesome photographs, over the objection of Defense [C]ounsel, to an extent that far outweighed any possible probative values."

The record contains a number of objections to the State's introduction of photographs. Defense counsel objected to still frames from the surveillance video showing various witnesses in different positions and to pictures of the inside and outside of the store from different angles, asserting that "at a certain point it is getting to be cumulative photos[.]" The court heard each objection and ruled that the photographs were not cumulative and were relevant.

We note that the defendant raised the issue of duplicative photographs of the crime scene in his motion for new trial. However, he did not provide a transcript of the hearing in the record on appeal for this court to see the trial court's analysis of the issue, although the record includes a written order denying the motion for new trial after a hearing. In any event, the admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must

first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

We cannot conclude that the trial court abused its discretion in allowing the photographs into evidence. Each photograph was relevant to present the layout of the scene or a witness's perception of the scene or perpetrator. "Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Faulkner, 154 S.W.3d 48, 70 (Tenn. 2005) (citing Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)). The defendant is not entitled to relief on this issue.

## V. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to establish his identity as the perpetrator of the felony murder in this case. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2010). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts." Id. § 39-13-202(b). Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a).

The identification of a defendant as the perpetrator of a crime is a question of fact for the trier of fact to determine from the evidence presented at trial. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

In the light most favorable to the State, the evidence is sufficient to establish the defendant's identity as the perpetrator of the offense. The day before the incident, Joseph Mario Williams, an employee of Sam's Food Market, was walking out the front door of the store when he noticed a man in dark clothing with his hood up and wearing a clear plastic mask turn around and walk away from the store. The morning of the incident, as he was hiding after the shooting, Williams observed that the gunman was the same man who had been at the store the day before, noting he had on the same clothing and same mask. Myron Jones, who was in the store at the time of the shooting, saw a man wearing a Halloween

mask come into the store, announce that it was a robbery, shoot the victim, and attempt to break into the store's cash register before taking cash from Jones and fleeing. Patricia Jean, who was walking to the store the morning of the shooting, noticed a man wearing a black hooded sweatshirt, jeans, and black shoes sitting in an alcove next to the entrance with his hands in his pockets. She saw that the man had a "little spot," such as a birthmark or freckle, on the right side of his face. Jean identified the defendant in a photographic array and in court as the man she spoke with outside of Sam's Food Market the morning of the shooting. Antonio Johnson, who was housed in the jail near the defendant, was told by the defendant that he had gone into a store to commit a robbery but was unable to do so because "he was detoured by some people." The defendant told Johnson that he went into the store a second time with a gun in hand, demanded money from the cash register, and shot the clerk in the face. The defendant told Johnson that there was a customer in the store who "fell to the ground" upon seeing the defendant, and the defendant took money from him before fleeing the store. The defendant told Johnson that he was wearing black clothing, gloves, and a mask. The defendant also told Johnson that his brother dropped him off at the store prior to the incident in a four-door, white 1999 Mercury. It was verified that the defendant's mother owned a four-door, white 1999 Mercury Sable. The jury saw video and photographic evidence of the crime taking place, as well as the time leading up to the crime and the "failed attempt" the day before, in light of which it could evaluate the witnesses' testimony. We note that any questions concerning Jean's ability to identify the defendant or the credibility of the witnesses' testimony were resolved by the jury as the trier of fact. Based on this evidence, a rational trier of fact could have found the defendant guilty of first degree felony murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-17-